# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-01322-SCT

*SCRUGGS, MILLETTE, BOZEMAN & DENT, P.A.*

*v.*

*MERKEL & COCKE, P.A.,  CHARLES M. MERKEL, JR., INDIVIDUALLY AND AS SHAREHOLDER IN MERKEL & COCKE, P.A.; CYNTHIA I. MITCHELL, INDIVIDUALLY AND AS SHAREHOLDER IN MERKEL & COCKE, P.A.; ALWYN H. LUCKEY; AND WILLIAM ROBERTS WILSON, JR., P.A.*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/21/2003 |
| TRIAL JUDGE: | HON. JAMES H. C. THOMAS, JR. |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | MARK A. NELSON |
| ATTORNEYS FOR APPELLEES: | RICHARD M. THAYER |
| | STEPHEN W. BURROW |
| | W. LEE WATT |
| | JOE R. COLINGO |
| | VICKI R. SLATER |
| | E. FOLEY RANSON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED |
| | ON CROSS-APPEAL: DISMISSED AS MOOT - 09/15/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND GRAVES, JJ.:**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This appeal involves a fee dispute between several attorneys.  The first attorney, Richard

F. Scruggs ("Scruggs"), is a senior member of the Scruggs, Millette, Lawson, Bozeman &

Dent, P.A. ("SMLB&D"), the appellant herein. Back in the 1980s, when mass tort litigation pertaining to asbestos exposure was gearing up, he formed Richard F. Scruggs, P.A. (Scruggs, P.A.), to handle many asbestos plaintiffs' cases. These plaintiffs were allegedly exposed to asbestos during their employment in Ingalls Shipyard in Pascagoula. Scruggs, P.A., hired attorney Alwyn H. Luckey ("Luckey"), an appellee,[1] to work on the asbestos cases.

¶2. In the meantime, the second attorney, William Roberts Wilson, was also being hired by potential asbestos plaintiffs. He formed William Roberts Wilson, P.A. (Wilson, P.A.), an appellee, to handle his asbestos cases.

¶3. Apparently, in the asbestos litigation, a lot of the footwork in developing the cases involved obtaining "picture books" which contained pictures of each product allegedly containing asbestos used in the different factories where the asbestos plaintiffs had worked. There were hundreds, maybe thousands, of products allegedly containing asbestos. When an asbestos plaintiff retained an attorney, the plaintiff would look at the attorney's picture book and identify any product he had seen or used during his employment. The attorney would then add the manufacturer of that product to his list of defendants. Most asbestos suits had scores of defendants.

¶4. A second labor-intensive aspect of the asbestos litigation was to acquire several expert witnesses who would testify, e.g., that the defendant manufacturer made the product between specific years, that the factory purchased the product in specific years, that the product was used in specific ways, and that the plaintiff was employed by the factory during the years that

---

[1]Luckey has been dismissed from this matter.

the product was in use. Medical expert witnesses were also needed to testify as to how the exposure to asbestos affected each plaintiff.

¶5. Asbestos plaintiffs' attorneys and asbestos defendants' attorneys quickly realized that sharing information and resources with one another would be time- and cost-effective.

¶6. As two asbestos plaintiffs' attorneys, Scruggs and Wilson decided to share their resources and formed another professional association, The Asbestos Group, P.A., to administer the over 200 asbestos lawsuits they had filed. The documents creating the Asbestos Group provided that Scruggs, P.A., and Wilson, P.A., would share all profits 50/50. Luckey, the attorney hired by Scruggs, P.A., began working at the Asbestos Group and, therefore, was working for both Scruggs and Wilson.

¶7. Sometime in the mid-1980s, a third attorney, Charles M. Merkel, Jr. ("Merkel"), an appellee, was retained by the William H. Scott family to prosecute their wrongful death/product liability claims against the asbestos manufacturers. Merkel was a senior member of the Merkel & Cocke, P.A. ("M&C"), law firm, an appellee herein. Merkel, not having any asbestos experience, approached Wilson to help him with the Scott lawsuit. Merkel and Wilson orally agreed to share the Scott lawsuit profits 50/50. Wilson agreed to provide Merkel with resources and expert witnesses, and Merkel was to prosecute the case. Merkel then asked Cynthia I. Mitchell ("Mitchell"), an attorney who worked at M&C and who is an appellee, to develop the Scott case. For all practical purposes, Merkel did not oversee the day-to-day work done on the Scott file.

¶8. As a discovery deadline in the Scott lawsuit approached, Mitchell told Merkel that they needed to obtain information on expert witnesses. Relying on his agreement with Wilson,

3

Merkel told Mitchell to call Wilson for that information. The information was provided as per their agreement.

¶9.    Later, before some depositions scheduled in Washington, D.C., Merkel met with Wilson to discuss strategy. Wilson informed Merkel that he had other business to tend to, but that Luckey would be able to prepare their expert witnesses and would attend the depositions. Wilson then introduced Luckey to Merkel, and Luckey performed the preparation for the depositions. Luckey attended the depositions but did not take part.

¶10.    From that point on, it appears that Luckey and Mitchell did most of the work on the case. Exhibits of record show that, in corresponding with Mitchell, Luckey sometimes used the Asbestos Group letterhead and sometimes used the Scruggs, P.A., letterhead. Luckey then entered an appearance and also listed Scruggs as counsel. Apparently, in the early 1990s, the Asbestos Group became aware that its name could violate a trademark, so Scruggs, P.A., and Wilson, P.A., stopped using the name "Asbestos Group." The Asbestos Group did not acquire a new name, but the agreement between Scruggs and Wilson and the administrative duties of the Asbestos Group continued.

¶11.    On February 26, 1991, Scruggs sent a memo to Luckey as follows:

> What are the fee arrangements with Merkel in the Scott case? It appears from the enclosed materials that there is a 1/3 attorney['Js fee contract[] to be split equally between Merkel and us. What is not clear is who "us" is. It appears so far that Bob [Wilson] has taken 50% of our 50%. Please explain.

¶12.    On August 7, 1992, Wilson, Wilson, P.A., Scruggs, Scruggs, P.A., and Luckey entered into an agreement which provided that: (1) Wilson, Wilson, P.A., Scruggs, and Scruggs, P.A., initially shared ownership of the Group equally; (2) In October of 1988, Wilson, Wilson, P.A.,

4

Scruggs, and Scruggs, P.A., gave Luckey 5% of the stock, thereby decreasing Wilson and Wilson, P.A.'s interest to 47.5% and decreasing Scruggs and Scruggs, P.A.'s interest to 47.5%; (3) In 1990, Luckey acquired an additional 10% of the stock, increasing his interest to 15%. Wilson and Wilson, P.A.'s interest was decreased to 40%, and Scruggs and Scruggs, P.A.'s interest was decreased to 45%; and (4) The "business relationship . . . existing between Wilson [and Wilson, P.A.] on one hand and Scruggs [and Scruggs, P.A.] and Luckey on the other hand is terminated . . . ."

¶13.    The Scott case was eventually settled for over $300,000.00. Settlement checks from the various defendants were received by M&C over the next several years. As the checks were received, M&C disbursed various sums to various payees: the Scott family, to itself, to Wilson, to Luckey, to Wilson and Luckey, and to the Asbestos Group. Mitchell testified as follows: "It was clear to me that they (Wilson or Luckey) didn't particularly care how checks were made payable, and different ways over the period of several years, and no one ever called up and complained that we needed to do something different."

¶14.    In 1993, Scruggs fired Luckey. In April of 1994, Luckey hired M&C to represent him in a suit against Scruggs and Wilson. This suit was filed in the Circuit Court of Hinds County.

¶15.    On September 23, 1994, the Manville Personal Injury Settlement Trust wrote a letter to Mitchell stating as follows:

> Our records indicate your received the discounted settlement as lead counsel for [William H. Scott] in February 1994. The law office of Richard Scruggs has called requesting confirmation of this payment, as they claim to be the co-counsel on this case. The system does not list a co-counsel on this claim. I have not yet

5

pulled the file from the warehouse to verify any information that may be in file but not on the system. I would appreciate it if you could confirm if they are indeed co-counsel for the case and approve their receipt of the payment information for Mr. Scott's claim.

¶16. On September 23, 1994, Mitchell responded as follows:

> In response to your earlier inquiry, this law firm associated William Roberts Wilson, Jr., as co-counsel on this case. Mr. Wilson in some manner associated Alwyn Luckey in this matter. I do not know the arrangements, if any, between Mr. Wilson and Mr. Scruggs regarding this case. Mr. Wilson's share of the fee has been paid to him.

¶17. After receiving notice of Scruggs' interest in the Scott proceeds, M&C began escrowing the money, interpleading it, or writing letters to Wilson, Luckey and Scruggs asking how to distribute it.

¶18. On September 22, 1997, Scruggs and Scruggs, P.A., assigned any proceeds they might receive from the Scott settlement to SMLB&D.

¶19. Scruggs filed this suit in the Jackson County Chancery Court against M&C, Merkel, Mitchell, Wilson, Wilson, P.A., and Luckey, alleging that they tortiously interfered with his contract with Wilson and Wilson, P.A., and that he is entitled to damages. Following a trial, the chancellor dismissed Scruggs' action with prejudice, finding that there was no evidence to support a finding that Merkel, Mitchell, or M&C intended to harm Scruggs, and that it was unclear, at best, whether Merkel, Mitchell or M&C had knowledge of Scruggs' agreements with Wilson and Luckey.

¶20. Based on the record, we conclude that the decision of whether or not to share their portion of the Scott proceeds was for Wilson and Luckey to make and that there is absolutely

no evidence that M&C, Merkel, and Mitchell had an intention to interfere with Scruggs' contract or to otherwise harm Scruggs. We therefore affirm the chancellor's judgment dismissing Scruggs' complaint.

## DISCUSSION

¶21.   The standard of review of questions of law is de novo. ***Howard v. Totalfina E & P, U.S.A.***, 899 So. 2d 882, 885 (Miss. 2005) (citing ***Miss. Transp. Comm'n v. Fires***, 693 So. 2d 917, 920 (Miss. 1997)).   We must reverse for erroneous interpretations or applications of law. ***Howard***, 899 So. 2d at 882 (citing ***Fires***, 693 So. 2d at 920)).   We cannot overturn the decree of a chancellor unless we find with reasonable certainty that the decree is manifestly wrong on a question of law or interpretation of facts pertaining to legal questions. ***Howard***, 899 So. 2d at 882 (citing ***In re City of Oak Grove***, 684 So. 2d 1274, 1276 (Miss. 1996)).

### WHETHER THE CHANCELLOR ERRED IN DISMISSING SCRUGGS' CLAIM OF INTENTIONAL INTERFERENCE WITH CONTRACT.[2]

¶22.   Even though Scruggs and Scruggs, P.A., assigned all rights to the settlement proceeds to SMLB&D, and even though SMLB&D filed this lawsuit, all of the claims arise from Scruggs and Scruggs, P.A's relationship with Wilson, Luckey and Wilson, P.A.   Therefore, when discussing SMLB&D's claim, we refer to the claim as belonging to Scruggs.

---

[2]Scruggs raises two more issues: First, he claims that the doctrines of quantum meruit and implied contract apply to this case; however, the final judgment entered by the chancellor does not address either issue.   Second, Scruggs claims that the chancellor should have granted him judgment on the interpled funds; however, the interpled funds were properly transferred to the Hinds County litigation.   Both of these claims are without merit.

¶23. In order to prevail on a claim for intentional interference with contract, a plaintiff must establish (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiff in his/her lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which acts constitute malice); and (4) that actual damage or loss resulted. ***Par Indus., Inc. v. Target Container Co.***, 708 So. 2d 44, 48 (Miss. 1998).[3]

¶24. The chancellor found that Scruggs established that he had suffered actual damage or loss (loss of 50% of the attorney's fees acquired through the settlement of the Scott case because Wilson and Luckey did not share with Scruggs, Scruggs, P.A., or the Asbestos Group their portion of the attorney's fees), but that Scruggs failed to make a prima facie case of intentional interference with a contract.

¶25. First, the chancellor found that Merkel, M&C and Mitchell had not acted intentionally or with malice when they did not include Scruggs, Scruggs, P.A., or the Asbestos Group in their disbursements. This finding is amply supported by the evidence which clearly shows that Wilson, Wilson, P.A., and Luckey were the ones who had the duty to share attorney's fees with Scruggs, Scruggs, P.A., or the Asbestos Group, and that *they*, not Merkel, M&C or Mitchell, violated that duty. Indeed, Wilson admitted that he did not share some of his disbursements with Scruggs because he felt that he had not gotten his fair share when the agreement between

---

[3]Scruggs' only claim against any of the defendants is that of tortious interference with a contract. A party to a contract cannot be liable for tortious interference with the same contract. Only a party independent of the contract can cause another to breach a contract. ***Par Industries, Inc. v. Target Container Corp.***, 708 So. 2d 44, 48 (Miss. 1998). Therefore, Scruggs' complaint fails against Wilson, P.A., a party to the contract.

Wilson, P.A., and Scruggs, P.A., dissolved. A plaintiff claiming intentional interference with a contract must prove that "the contract would have been performed but for the alleged interference." *Par Indus.*, 708 So. 2d at 48. There is absolutely no evidence that Merkel told Wilson not to pay Scruggs because Wilson had not gotten his fair share from Scruggs.

¶26. Texas courts require that an additional element[4] be shown in order to prove intentional interference with a contract, and we find that this additional element is impliedly required by Mississippi courts. Texas courts require a showing that the defendant's acts were the proximate cause of the loss or damage suffered by the plaintiff. *See, e.g., Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex. 1994). It is clear that Wilson and Luckey's actions were the proximate cause of Scruggs, P.A. and Scruggs' losses, not anything Merkel might have done or failed to do.

¶27. Finally, when Mitchell discovered that Scruggs or Scruggs, P.A., believed that it had a claim to part of the settlement proceeds, M&C began escrowing or interpleading all disbursements, or writing letters to Wilson, Luckey and Scruggs asking for directions on how to distribute the funds.

¶28. Scruggs argues that intent may be implied when the "defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract." *Par Indus.*, 708 So. 2d at 48. The chancellor correctly held that more than basic awareness of an association between

---

[4]The Texas elements are: the existence of a contract subject to interference, a willful and intentional act of interference, actual damages or losses, and the willful and intentional acts being the proximate cause of the actual damages or losses. *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex. 1994).

two lawyers is necessary to constitute a finding of intentional interference with a contract. It is clear that Merkel, M&C and Mitchell did not have knowledge of the existence of the agreement between Wilson, P.A. and Scruggs, P.A. They did have knowledge of the fact that Luckey worked in Scruggs' office and that he sometimes used Scruggs, P.A. letterhead. But Luckey explained away those disparities by stating that he worked for the Asbestos Group and that the Asbestos Group could not continue to use that name. Because he could not use Asbestos Group letterhead, he used Scruggs, P.A., letterhead. These circumstances do not constitute actual or implied knowledge of the contract between Wilson, P.A., and Wilson, P.A. Indeed, any rational person would be confused by all of the convoluted relationships under which the asbestos claims were handled.

¶29. For intent to be implied, a plaintiff must show that the defendant knew of the existence of a contract and did a wrongful act without legal or social justification that he was certain or substantially certain would result in interference with the contract. *Par Indus.*, 708 So. 2d at 48. The United States District Court for the Southern District of Mississippi has held that "it is equally established that the interference complained of must be wrongful in order to be actionable and that any interference is not wrongful and actionable if undertaken by someone in the exercise of a legitimate interest or right, which constitutes 'privileged interference.'" *Martin v. Texaco, Inc.*, 304 F. Supp. 498, 502 (S.D. Miss. 1969). Here, Merkel entered into an agreement with Wilson to assist Merkel with the Scott case. As part of the agreement, Merkel was required to pay Wilson, and only Wilson. Therefore, even if Merkel had knowledge of an agreement between Scruggs and Wilson and Merkel's act of paying Wilson constituted interference, Merkel was still required to split the fees from the Scott case under

10

the Merkel-Wilson agreement and had a legitimate right to do so. In other words, although Merkel's payment to Wilson may have interfered with the Scruggs-Wilson agreement, Merkel had a legitimate right to pay Wilson and, as such, Merkel's actions constituted a privileged interference.

¶30. Scruggs' own actions belie his claims. Even after he had notice of the Scott settlement as evidenced by his 1991 interoffice memorandum to Luckey, Scruggs *never* contacted anyone at M&C to inform them that the funds were not being disbursed correctly.

¶31. Finally, there is no evidence that the disbursements were made to Wilson, Wilson, P.A., Luckey or the Asbestos Group in order to cause damage or loss to Scruggs or Scruggs, P.A. There is no evidence of any ill will or malice between Merkel, M&C and Mitchell on the one hand and Scruggs or Scruggs, P.A., on the other. Indeed, if there was any ill will or malice between these parties, it arose after Scruggs attempted to have M&C disqualified in the Hinds County action and, when the motion to disqualify was denied, Scruggs filed the instant lawsuit against Merkel, M&C and Mitchell.

¶32. Scruggs' claim of intentional interference with contract was properly dismissed by the learned chancellor.[5]

## CONCLUSION

¶33. Although the evidence supporting the chancellor's decision is substantial, most telling is the fact that Scruggs knew of the Scott settlement disbursements as early as 1991, and he

---

[5]In a cross-appeal, Merkel, Mitchell and M&C argue that SMLB&D had no standing to bring this lawsuit and that the statute of limitations had run on SMLB&D's claims before it filed this lawsuit. Because we find that the chancellor was correct in dismissing the lawsuit, we dismiss the cross-appeal as moot.

did *absolutely nothing* to assert and protect his claims until after Luckey filed the lawsuit against Scruggs. The chancellor found that Scruggs' claim had no merit, and that, indeed, what little proof was offered to support his claim, amounted to nothing more than conjecture and assumptions. We affirm the chancellor's judgment dismissing Scruggs' complaint.

¶34. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: DISMISSED AS MOOT.**

**SMITH, C.J., COBB, P.J., EASLEY AND DICKINSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, CARLSON AND RANDOLPH, JJ., NOT PARTICIPATING.**