# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00742-COA

**WILLIAM JODY CROMWELL**                                    **APPELLANT**

**v.**

**NANCY WILLIAMS AND WOODROW**                          **APPELLEES**
**BRAND III**

DATE OF JUDGMENT:            06/23/2020
TRIAL JUDGE:                 HON. JOHN R. WHITE
COURT FROM WHICH APPEALED:   MONROE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      JIM WAIDE
ATTORNEYS FOR APPELLEES:     MARK NOLAN HALBERT
                             WILLIAM MICHAEL BEASLEY JR.
NATURE OF THE CASE:          CIVIL - CONTRACT
DISPOSITION:                 AFFIRMED - 01/18/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., LAWRENCE AND EMFINGER, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     William Cromwell, a certified registered nurse anesthetist (CRNA), was employed as an independent contractor with Monroe Regional Hospital (Monroe Regional) when his contract was terminated on January 5, 2018. Cromwell subsequently sued Dr. Woodrow Brand III, the chief surgeon, and Nancy Williams, the operating-room manager, for tortious interference with his contract. The Defendants filed a motion for summary judgment. Following a hearing, the circuit court granted the Defendants' motion. Cromwell appealed. After review, we find that Dr. Brand and Williams are immune from tort liability because they acted in the course and scope of their employment when relaying information to their

hospital administrator, and there is no genuine issue of material fact as to whether either party was acting in bad faith. *See Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). Therefore, we affirm the circuit court's grant of summary judgment in favor of the Defendants.

## FACTS AND PROCEDURAL HISTORY

¶2.    Cromwell worked as a CRNA for over forty years in various hospitals throughout northern Mississippi. Prior to working at Monroe Regional in Aberdeen, Mississippi, Cromwell had worked with both Defendants at Gilmore Hospital in Amory, Mississippi, for over fifteen years. In 2014, a company named Pioneer Health Services (Pioneer) hired Cromwell as an independent contractor. After Cromwell signed his contract, he learned Pioneer had also hired Williams, a former surgical nurse, to manage the hospital's operating room. Pioneer hired Dr. Brand as the chief of surgery. Dr. Brand performed most of the surgeries and all the complex surgeries at the hospital. In May 2015, Chris Chandler became the hospital administrator. As the hospital administrator, Chandler supervised Cromwell, Williams, and Dr. Brand. Pioneer was purchased by Boe Vida in 2017, and the hospital was later renamed Monroe Regional. Chandler, as the hospital administrator; Dr. Brand, as the chief surgeon; Williams, as the operating-room manager; and Cromwell, as a nurse anesthetist, all continued to work at the hospital without signing new contracts.

¶3.    After Chandler became the hospital administrator, Dr. Brand, Williams, and other members of the surgery team raised several concerns regarding Cromwell's ability to provide quality anesthesia services. The four primary complaints were (1) insufficient anesthesia,

which caused some patients to begin to move during surgery; (2) difficult intubations; (3) hearing issues; and (4) mobility issues. Chandler investigated those complaints and concluded that Cromwell's quality in anesthesia was "deteriorating." As a result, Chandler informed Dr. Brand that he planned to consult the president and owner of the hospital, Dr. Kirnjot Singh. Chandler recommended to Dr. Singh that the hospital exercise its ninety-day notice-of-termination-without-cause provision in Cromwell's contract with Pioneer. Dr. Singh ultimately authorized Chandler's recommended action. Chandler met with Cromwell on January 5, 2018, and gave him his termination letter with his effective date of termination being April 6, 2018. During that meeting, Chandler explained to Cromwell that the termination decision was between him, Dr. Brand, and Dr. Singh.

¶4. On August 15, 2018, Cromwell filed suit against Dr. Brand and Williams for tortious interference with his contract. Specifically, he claimed that both Defendants "entertained personal animosity and hostility towards [him]" and that his contract would not have been terminated if not for the "influence" of the Defendants. The Defendants subsequently filed an answer and affirmative defenses and argued that Cromwell's claim should be dismissed for failure to state a claim upon which relief could be granted, pursuant to Mississippi Rule of Procedure 12(b)(6). Both parties conducted discovery and deposed Cromwell, Chandler, Dr. Brand, Williams, Dr. Singh, and several other employees who had worked at Monroe Regional with Cromwell.

¶5. On January 22, 2020, the Defendants filed a motion for summary judgment. In essence, the Defendants argued that Cromwell's claim failed as a matter of law because he

3

was unable to show that Dr. Brand or Williams acted outside the course and scope of their employment, acted with malice, or that their actions proximately caused his termination. In regard to Williams, the Defendants also argued there was no evidence that Williams caused the hospital to terminate Cromwell's contract. The Defendants highlighted the fact that Williams never recommended Cromwell's termination and that she had no knowledge of his termination until afterward. On February 27, 2020, Cromwell filed a response in opposition to the Defendants' motion for summary judgment. In relevant part, Cromwell argued that his claim should survive summary judgment because there was "overwhelming evidence" that both Dr. Brand and Williams acted in bad faith in reporting concerns to Chandler. To support his argument, Cromwell provided depositions of other co-workers who testified they had never had any issues with Cromwell's performance.

¶6. On June 16, 2020, the circuit court held a hearing on the Defendants' motion for summary judgment and heard arguments from counsel. Following the hearing, the court entered an order granting the Defendants' motion for summary judgment. Cromwell appeals from that final judgment.[1]

## STANDARD OF REVIEW

¶7. This Court reviews an appeal from summary judgment de novo. *Venture Inc. v. Harris*, 307 So. 3d 427, 431 (¶14) (Miss. 2020) (quoting *Double Quick Inc. v. Moore*, 73 So. 3d 1162, 1165 (¶7) (Miss. 2011)). Mississippi Rule of Civil Procedure 56(c) provides that summary judgment is appropriate where "the pleadings, depositions, answers to

---

[1] On appeal, the State of Mississippi filed an amicus brief in favor of the Defendants.

4

interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "'The evidence must be viewed in the light most favorable to the party against whom the motion has been made[,]'" and "[t]he moving party has the burden of demonstrating that no genuine issue of material facts exists, [giving] . . . the non-moving party . . . the benefit of the doubt concerning the existence of a material fact." *Duckworth v. Warren*, 10 So. 3d 433, 436-37 (¶9) (Miss. 2009) (quoting *One S. Inc. v. Hollowell*, 963 So. 2d 1156, 1160 (¶6) (Miss. 2007)). Even so, "[t]he mere existence of some alleged factual dispute between the parties . . . will not defeat an otherwise properly supported motion for summary judgment; '[t]he dispute must be genuine, and the facts must be material.'" *Smith v. City of Southaven*, 308 So. 3d 456, 461 (¶16) (Miss. Ct. App. 2020) (quoting *Williams v. Bennett*, 921 So. 2d 1269, 1272 (¶10) (Miss. 2006)). "To be exact, the content of summary-judgment evidence must be admissible at trial although the evidence may be in a form, such as an affidavit, that would not be admissible." *Ill. Cent. R.R. Co. v. Jackson*, 179 So. 3d 1037, 1043 (¶14) (Miss. 2015); *accord* 1 Jeffrey Jackson et al., *Mississippi Civil Procedure* § 16:22 (updated May 2021). "Thus, hearsay statements that would not be admissible at trial are incompetent to support or oppose summary judgment." *Id*. (citing *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist*., 635 F.3d 685, 692 (5th Cir. 2011)).

## ANALYSIS

¶8. Cromwell claims there is a genuine issue of material fact as to whether Dr. Brand and Williams are liable for tortious interference with his contract. Tortious interference with

5

contract is the "malicious or intentional interference with a valid and enforceable contract by a third party which causes one contracting party not to be able to perform and the failure to perform results in a monetary loss for the other contracting party." *Courtney v. Glenn*, 782 So. 2d 162, 164-65 (¶9) (Miss. Ct. App. 2000) (citing *Cenac v. Murry*, 609 So. 2d 1257, 1268 (Miss. 1992)). To establish a claim for tortious interference, a plaintiff must show "[(1)] that the [defendant's] acts were intentional and willful; [(2)] that they were calculated to cause damage to the plaintiffs in their lawful business; [(3)] that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and [(4)] that actual damage and loss resulted." *Cenac*, 609 So. 2d at 1268-69; *see also Irby v. Citizens Nat'l Bank of Meridian*, 239 Miss. 64, 67, 121 So. 2d 118, 119 (1960). Further, the Mississippi Supreme Court has stated that the element of proximate cause is an "additional element impliedly required by Mississippi courts." *Scruggs, Millette, Bozeman & Dent P.A. v. Merkel & Cocke P.A.*, 910 So. 2d 1093, 1099 (¶26) (Miss. 2005).

¶9. In this case, Cromwell signed a contract with Pioneer, which was later bought by Boe Vida and renamed Monroe Regional. Cromwell never signed a new contract with Monroe Regional. His original contract specified that it was an at-will employment relationship. The supreme court has recognized the viability of a claim for tortious interference with contracts even when the contractual relationship is an at-will employment. *See Levens v. Campbell*, 733 So. 2d 753, 760 (¶27) (Miss. 1999).

¶10. Dr. Brand and Williams argue that because they were employees and agents of

Monroe Regional, they could not be considered "third parties" and interfere with a contract between their employer and Cromwell. The State takes a similar position in its amicus brief. In 1985, Mississippi added the bad-faith component to the agency consideration, holding that "one occupying a position of responsibility on behalf of another is privileged, within the scope of that responsibility and absent bad faith, to interfere with his principal's contractual relationship with a third person." *Shaw*, 481 So. 2d at 255 (citing Restatement (2d) of Torts § 770 cmt. b, ill. 3 (1979)). "[T]he interference complained of must be wrongful in order to be actionable[,] and any interference is not wrongful and actionable if undertaken by someone in the exercise of legitimate interest or right, which constitutes 'privileged interference.'" *Gulf Coast Hospice LLC v. LHC Group Inc.*, 273 So. 3d 721, 746 (Miss. 2019) (quoting *Vestal v. Oden*, 500 So. 2d 954, 957 (Miss. 1986)).

¶11. Contrary to Mississippi law, forty other states have held that if an individual is an agent of one of the contracting parties and acts within the course and scope of that agency, there is no claim for tortious of interference with contract because there is no third party interfering. *See infra* note 4. In other words, the agent acting within the course and scope of his agency cannot be sued for doing that which he has a right to do as part of that agency. Mississippi has adopted a modified view and allows a plaintiff to prove the additional element of bad faith to have an actionable claim of tortious interference with contract. *See Shaw*, 481 So. 2d at 255; *Vestal*, 500 So. 2d at 957. Thus, in accordance with Mississippi law, Dr. Brand and Williams, if acting in the course and scope of their employment with Monroe Regional, cannot be sued as a third party for tortious interference with a contract

between Monroe Regional and Cromwell unless they acted in bad faith.

¶12. The Defendants ask this Court to adopt a view similar to what forty other states have adopted. That would require this Court to modify the Mississippi Supreme Court's opinions in *Shaw* and *Vestal*. "[T]his Court cannot overrule Supreme Court precedent." *Evans v. State*, 282 So. 3d 659, 663 (¶14) (Miss. Ct. App. 2019) (quoting *Thompson v. State*, 230 So. 3d 1044, 1055 (¶36) (Miss. Ct. App. 2017)). Further, this Court is bound to follow the law as pronounced by the supreme court. *See, e.g.*, *Cook v. State*, 242 So. 3d 865, 873 (¶25) (Miss. Ct. App. 2017). Therefore, this Court cannot adopt what forty other states have adopted.[2] Because of *Shaw* and *Vestal*, the Mississippi Supreme Court would have to eliminate the bad-faith component and adopt the rule that when an agent acts on behalf of the principal within the course and scope of his employment, there can be no tortious interference with contract because there is no third party interfering with the contract of the principal and another.

### 1. Were Dr. Brand and Williams agents of Monroe Regional?

¶13. The first step in analyzing this case under present Mississippi law is to determine

---

[2] The many cases dealing with this issue in Mississippi present some confusion on the exact nature of the law. To prove tortious interference with a contract, the third element requires a plaintiff to prove "unlawful conduct . . . without a right or justified cause." *See Irby*, 239 Miss. at 67,121 So. 2d at 119. Further, the supreme court has held that an agent acting on behalf of the principal is privileged from tortious interference unless acting in bad faith. *See Shaw*, 481 So. 2d at 255. How a plaintiff could prove the third element of tortious interference (without right or justified cause) and not prove bad faith at the same time has never been addressed by the appellate courts of this State. It would appear that if an agent acted in bad faith, he would also be acting unlawfully without right or justified cause. If that is the case, the additional element is somewhat redundant and may be unnecessary.

whether Dr. Brand and Williams were indeed agents of Monroe Regional. "Under the law of agency, a principal is bound by the actions of its agent within the scope of that agent's real or apparent authority." *Langham v. Behnen*, 39 So. 3d 970, 974-75 (¶10) (Miss. Ct. App. 2010). "Apparent authority exists when a **reasonably prudent person**, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Barnes, Broom, Dallas & McLeod PLLC v. Est. of Cappaert*, 991 So. 2d 1209, 1212 (¶10) (Miss. 2008). In this case, Dr. Brand testified that he was the surgical director for the hospital and had no supervisory authority over any hospital employees, but he said that he was the only surgeon in the hospital and was the chief person dealing with patients. As for Williams, she was also an employee of the hospital as the manager of the operating room. She admitted that she had no management over the anesthesiologist. She indicated that the anesthesiologists reported to Dr. Brand and the hospital administrator. Cromwell admitted Williams' responsibilities included "run[ning] the operating room [and] quality assurance . . . ." A reasonably prudent person would certainly assume that Dr. Brand and Williams were agents acting on behalf of Monroe Regional in ensuring the quality of care provided to patients of the hospital's operating room.

> **2. Were Dr. Brand and Nurse Williams acting within the course and scope of their employment when relaying information about their observations of the operating room to the hospital administrator?**

¶14. This Court has defined an employee's conduct as being within the scope of employment if "(a) it is of the kind he is employed to perform; (b) it occurs substantially

within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." *Comm. Bank v. Hearn*, 923 So. 2d 202, 208 (¶18) (Miss. 2006). It is without dispute that hospitals are charged with ensuring safe and quality health care for patients. Rule 41.7.1 of the Mississippi Department of Health's "Minimum Standards of Operation for Mississippi Hospitals" explicitly states that "[hospitals] shall have an organized medical staff that **has the overall responsibility for the quality of all medical care provided to patients**, **and for the ethical conduct and professional practices of its members** . . . ." (Emphasis added). *See also* Miss. Code Ann. § 41-9-17 (Rev. 2018) ("The licensing agency shall adopt, amend, promulgate and enforce such rules, regulations and standards with respect to all hospitals . . . .").

¶15. Undoubtedly, Dr. Brand and Williams' primary duty was to the hospital's patients. Both Williams and Cromwell testified in their depositions that Williams was in charge of quality assurance. As part of their duties, Dr. Brand and Williams had a responsibility to report concerns that would negatively affect patient care. It is clear from Dr. Brand's and Williams' depositions that they were both concerned with how Cromwell's issues affected the safety of their patients. After review, this Court finds that relaying information to hospital administration about concerns relating to the operating room was clearly within the course and scope of Dr. Brand and Williams' employment. Therefore, as agents/employees of the hospital, relaying this information to the administration of that hospital was within the course and scope of their employment, and they are privileged from liability for tortious interference of contract as long as they did not act in bad faith. *See Shaw*, 481 So. 2d at 255.

10

**3.     Did Dr. Brand or Nurse Williams engage in bad faith when they reported information concerning the activities in the operating room to Monroe Regional?**

¶16.    Cromwell argues that both Defendants acted in bad faith in reporting information to the hospital administrator and therefore cannot claim immunity from his tortious interference claim.  The Defendants argue that Cromwell failed to present any evidence that gives rise to an inference of bad faith that would vitiate the privilege of tort immunity.

¶17.    The issue of bad faith as it relates to employees acting in the course and scope of their employment has been a somewhat difficult issue since the supreme court's pronouncement in *Shaw v. Burchfield*.  *Shaw*'s pronouncement relied on a comment to the Restatement (Second) of Torts section 770.  481 So. 2d at 255.  However, section 770 never uses the words "bad faith" and does not define "bad faith."  Further, *Shaw* did not define bad faith in that context, nor has any other supreme court opinion done so.  The first attempt to provide clarity as to a definition of bad faith appears to be by this Court in *Morrison v. Miss. Enter. for Tech. Inc.*, 798 So. 2d 567, 575 (¶27) (Miss. Ct. App. 2001), when this Court posed the question of whether "bad faith required **more** be proven than the four normal elements of the tort[.]" *Id*. at (¶27).  This Court held "the act must be intentional and not merely negligent." *Id*. The Court added that "the purpose must be to interfere with the person's lawful contract or employment relation; there must not be right nor justification involved with the interference." *Id*.  The *Morrison* Court ultimately found "that when an intentional act occurs whose purpose is to cause injury to business **without right or good cause**, then there is malice." *Id*. at (¶28) (emphasis added).  This Court also held that "[a] person occupying a

11

position of responsibility on behalf of another is 'privileged,' which is another word for having a right." *Id*. It appears the *Morrison* Court attempted to define bad faith as it is used in the tortious-interference context by simply substituting "without right or good cause" for the elements of that tort. If that is indeed the case, then using the term "bad faith" seems to be an exercise in redundancy. Thus, a person occupying a position of responsibility on behalf of another, and acting within the course and scope of that responsibility, is privileged unless he or she acts in bad faith. Regardless of whether bad faith is or is not a redundant exercise from the third element of "without right or justifiable cause," the supreme court presently requires a review for bad faith when determining if an employee/agent can be sued for tortious inference of a contract between the employer/principal and another. So, in this case, the question becomes: Did Dr. Brand and/or Williams act in bad faith by providing information to their employer about Cromwell?

¶18. Because this is a de novo review, reviewing the depositions in this case becomes a necessary fact-finding function to determine if there are any genuine issues of material fact as to the claims asserted by Cromwell. In his deposition, Cromwell testified that he worked with Williams and Dr. Brand for over fifteen years at Gilmore Hospital in Amory. He also testified that Williams' responsibilities as the operating room manager were "running the operating room and the nurses, holding meetings, and quality assurance." He further stated that Williams was not his supervisor. Cromwell testified that he reported directly to Chandler and that Dr. Brand was "in charge." Cromwell testified that he and Williams "pretty much" got along. He stated that he had problems working with Williams as part of

the surgical team "a few times," including when they worked together at Gilmore Hospital. When asked what kind of problems he had with Williams, he responded, "The biggest thing we had was telling us to go and put the patient to sleep, you know, before a physician was there." Cromwell stated that he ignored Williams when she made those requests because a doctor was not present. When asked about the standard rule for starting anesthesia, Cromwell acknowledged that the surgeon has to be in the hospital or in the area before the anesthesia begins. When asked if he and Williams ever argued about his decision not to put a patient under anesthesia until he a doctor was there, he responded, "No sir." Cromwell stated that no other administrators became involved when he ignored Williams' requests. However, he also stated that he went directly to Chandler to report Williams' requests. When asked about whether he had trouble hearing alarms going off in the hospital, Cromwell responded, "I could hear it, but I was not worried about it, but they would come over and say it was going off . . . . I had trouble with the ventilator one time and it would give false alarms and I just ignored them all." Cromwell admitted he had knee issues and "sometimes" used a walker to go to patients' rooms and when he was walking to and from the hospital. Cromwell also admitted that he had problems intubating some patients but stated that those problems were due to the particular difficulties of those cases and not due to his age or ability.

¶19. Chris Chandler testified in his deposition that he became the hospital administrator with Pioneer Hospital in May 2015 and remained the hospital administrator after the hospital changed ownership in 2017. When asked who made the decision to terminate Cromwell's

contract, he responded, "It was a collective decision between myself, the chief of surgery[,] and the owner of the company." Chandler testified that "[t]he overall complaints were insufficient anaesthesia during some cases, difficult intubations, ignoring alarms in surgery, [and] inability to stand in some cases." Chandler stated that Dr. Brand, Williams, and other members of the surgery department "complained" about Cromwell. Chandler elaborated, stating that Dr. Brand "complained about insufficient anaesthesia three to four times." Relatedly, Chandler testified that Cromwell complained about Williams and how "she was overstepping her bounds with anesthesia direction." Both Dr. Brand and Williams complained to Chandler about how Cromwell would sometimes not hear the alarms in the hospital. Cromwell admitted in his deposition that he had hearing loss and wore hearing aids. As for the complaint concerning insufficient intubation, Chandler testified that "that was one particular case, we had a difficult intubation that was brought to me by those same people." Chandler investigated this complaint by interviewing hospital staff members, including Dr. Brand, Williams, and another worker. Based on their interviews, Chandler concluded "that there was difficulty in intubating this patient, which is a concern for me as an administrator[, and] . . . there was [also an] inappropriate conversation between [Cromwell and the patient's family], when that was the responsibility of the provider, the doctor." The fourth complaint—Cromwell's inability to stand—was brought to Chandler's attention by Dr. Brand, Williams, and other staff members. Chandler also testified to his own personal experience with Cromwell's hearing issues, stating that "I recall one particular conference call we had with a vendor about some anaesthesia equipment, and we had a vendor on the

14

phone and I had to repeat everything to [Cromwell] so he could hear the case."

¶20.   Chandler testified about his conversation with Dr. Singh that resulted in Cromwell's termination:

> I told him that I felt like over time that our quality in anaesthesia with . . . Cromwell was deteriorating.  And that it was my job and I felt like I needed to let Dr. Singh know of the concerns and the perceived liability that we had with that care.  And so based on that conversation, we decided to give the 90-day notice of termination of the contract.

Chandler specifically stated that he recommended the ninety-day notice and that Dr. Singh approved his recommendation.  When Chandler terminated Cromwell, he stated that "the chief of surgery, hospital administration[,] and the owner of the company made a decision to make a change in anaesthesia services."

¶21.   In his deposition, Dr. Brand testified about his complaints to Chandler regarding Cromwell.  He stated that "[Cromwell] had difficulty walking and standing.  And you know . . . [Chandler] and I had discussed that, but it was our understanding that [Cromwell] was going to have something done about that [so we were] . . . waiting for that to happen and hopefully see some improvement."  Dr. Brand also testified that Cromwell had hearing issues, stating "There was times when the alarms would be going off in the operating room fairly constantly."  Dr. Brand continued, "[T]here were [also] other issues where the patient would become light during the case and start moving about and we would have to ask [Cromwell] to redose them . . . ."  In regard to the intubation incident, Dr. Brand testified that while the patient was in recovery, the patient's laryngeal mask airway (LMA) was removed:

> I'm not sure who took it out or what, but the LMA was out.  And [Cromwell] was at the head of the bed trying to intubate her again.  And it seemed to me

15

it was rather rough and there was a lot of bleeding . . . . [Cromwell] did that without talking to me and even after we had been unable to intubate her before. And we had a precarious airway that we could lose because of bleeding and edema as a result of his repeated unsuccessful attempts at intubation.

Dr. Brand stated that before Cromwell was terminated, he was "fairly certain" Dr. Singh had called him to discuss Cromwell's work performance. Dr. Brand testified that Dr. Singh "basically explained the facts as he understood them [from Chandler] . . . and he was just asking me to make sure he understood the facts correctly." Dr. Brand was asked if he had ever requested that a patient be put to sleep without him present." He responded "no" and said that he was not aware of any other employee asking an anesthesiologist on his behalf to put a patient to sleep. Dr. Brand stated that he did not think it was "illegal" but that it was not "good practice." As for starting a patient's anesthesia without a doctor present, Dr. Brand stated that, "it's not uncommon practice . . . to do what they call flip where you do a case in one room and then they have the patient in the next room waiting for you. So those situations, those patient[s] always go to sleep before the doctor gets in the room."

¶22. Williams testified that she was the manager of the operating room but not the manager of the anesthesiologists. She testified regarding her complaints about Cromwell, which she had relayed to Chandler. For example, Williams stated that Cromwell "would go in sometimes and he would ask a patient to move their legs over so he could sit down on their bed, if there was not a seat available." According to Williams, Cromwell seemed "better" initially after his knee surgery, but he still used his walker. She stated that roughly six months after his surgery, Cromwell began to decline:

16

I would say over maybe six months after the surgery, it started going downhill and it kind of looked like at a rapid rate. [Cromwell] got to where he could not walk without holding onto something, whether that was the guardrail on the wall [or] his anesthesia cart. And they would tell me from the [operating room] in the back that when they got a patient off the table, he would have to pull up using the stretcher. He could not independently stand up from the chair.

When asked about Cromwell's hearing issues, Williams stated that it was "aggravating" and that patients would ask her if Cromwell was putting them to sleep. Williams testified that she was not involved in the investigation that Chandler conducted. Finally, Williams denied ever asking Cromwell to start anesthesia without a doctor present and claimed that would be "illegal."

¶23. Cromwell provides no evidence to support his allegation of bad faith against Dr. Brand. As for Williams, Cromwell relies on Williams' statement in her deposition that it would be "illegal" to start anesthesia. Cromwell failed to provide any evidence that Williams was motivated to have his contract terminated for an allegedly illegal anesthesia incident. In addition, there was no evidence in the record to confirm Cromwell's speculation that Williams wanted him let go for not starting anesthesia at her request. No one testified that Williams made a statement to that effect. Further, there was no testimony that proves her motive in talking to Chandler about the operating room was anything other than her concerns about the operating room. And Cromwell admitted that Williams' concerns about hearing loss and mobility issues were truthful. As the operating room manager, relaying information to management about the operating room in this context was within the course and scope of her employment and not evidence of malice.

¶24. Assuming for argument purposes only that Williams did have ill-will toward Cromwell for not starting an allegedly illegal anesthesia and intentionally acted to cause injury without right or good cause, Cromwell cannot show this was the basis or the proximate cause for his contract's termination. According to Chandler's deposition testimony, there were four areas that caused the hospital concerns related to Cromwell's actions in the operating room: (1) insufficient anesthesia; (2) difficult intubations; (3) hearing issues; and (4) mobility issues. Cromwell admitted to having hearing issues, mobility issues, and that he would have to "redose" some patients. He also admitted that there was a particular case where there were issues with intubation, but he claimed those were not due to his abilities but instead was case specific. Cromwell essentially admitted, although with explanation, to the concerns Chandler listed in his deposition as a basis for the termination. Further, there was no evidence in the record that Williams requested that Cromwell be let go or that she even knew that his contract was being terminated. She testified to the contrary and stated that she did not find out about his contract's termination until after the fact. Thus, because Cromwell failed to show any genuine issue of material fact relating to whether Dr. Brand or Williams acted in bad faith or that Williams' alleged ill-will toward him proximately caused his termination, his tortious-interference claim against both parties fails.

¶25. With regard to Dr. Brand, there is no dispute that he relayed truthful information when he spoke to Dr. Singh and Chandler. Further, Williams told Chandler truthful information. Cromwell admitted that he had hearing and mobility problems. In addition, Cromwell admitted that the incidents alleged by Dr. Brand and Williams occurred, but he offered

18

explanations as to why they occurred. If Cromwell admits they occurred, then they are obviously truthful. The Defendants ask this Court to adopt the approach in the Restatement (Second) of Torts section 772 (1979), which would automatically shield Dr. Brand and Williams from a tortious interference claim. Section 772 states, "One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person (a) truthful information, or (b) honest advice within the scope of a request for the advice."[3] Here, Dr. Brand and Williams gave truthful information to Monroe Regional (the third person for purposes of section 772), which according to Cromwell, caused Monroe Regional "not to perform" the contract between him and Monroe Regional. Under this Restatement section, if Dr. Brand and Williams provided "truthful information" about Cromwell to the administration at the hospital, they would be privileged. Further, section 772(b) would apply to Dr. Brand because Dr. Singh, the owner of the hospital, testified that he called Dr. Brand and asked him about the operating-room problems. Dr. Brand gave his advice to Dr. Singh after being asked.

¶26. In support of their argument, the Defendants emphasize that at least twenty courts, both state and federal, have relied on Restatement (Second) of Torts section 772 in whole or in part and reasoned that an individual relaying truthful information to a contracting party cannot be subject to tortious interference with a contract. *See infra* note 5. After review, we

---

[3] Notably, in Mississippi for defamation claims, the truth has been an "absolute defense" for over one hundred years. *See, e.g.*, *Neely v. Payne*, 126 Miss. 854, 89 So. 669, 671 (1921); *J. Pub. Co. v. McCullough*, 743 So. 2d 352, 360 (¶26) (Miss. 1999) ("Truth is an absolute defense to a defamation lawsuit in Mississippi.").

19

agree with the principles set forth in Restatement section 772 to the extent they apply to the facts of this case. Therefore, an agent of a principal cannot be liable for tortious interference with a contract that the principal has with another when relaying truthful information during the course and scope of his or her agency. Additionally, an agent of a principal cannot be liable for tortious interference when providing honest advice within the scope of a request for that advice. Recognizing a hospital's interest in maintaining a safe operating room and ensuring the health of its patients, we find that providing truthful information to that employer was certainly within the course and scope of Dr. Brand's and Williams' employment. Adopting section 772 of the Restatement, which shields an individual who provides truthful information to his employer, does not interfere with or modify the supreme court's holdings in *Shaw* and *Vestal*, nor this Court's many cases decided under those precedents. Quite the contrary, it is legally impossible to act in bad faith when an employee provides "truthful information" to his or her employer concerning the safety and health of patients being treated at the hospital owned by the employer. If Dr. Brand or Williams had lied to their employer and if those lies resulted in the termination of Cromwell's contract, then Cromwell could have attempted to prove bad faith and pursued a claim under Mississippi law in accordance with *Shaw* and *Vestal*. But that is not the case here. Thus, we find that because Dr. Brand and Williams relayed truthful information about Cromwell to their employer, they cannot have acted in bad faith and cannot be liable for tortious interference with Cromwell's contract. Accordingly, Cromwell's claim against Dr. Brand and Williams cannot survive summary judgment.

## CONCLUSION

¶27. Summary judgment is proper in this case because there is no genuine issue of material fact as to whether Dr. Brand or Williams are liable for tortious interference with Cromwell's contract. Both individuals (1) had authority to act on behalf of the principal and (2) acted within the course and scope of their employment. In order to vitiate the privilege of immunity, Cromwell was required to show a genuine issue of material fact as to whether Dr. Brand or Williams acted in bad faith. He has not. Accordingly, we affirm the circuit court's order granting summary judgment in favor of the Defendants.[4 & 5]

---

[4] Forty other states have held that if an individual is an agent of one of the contracting parties and acts within the course and scope of that agency, there is no claim for tortious interference with contract because there is no third party interfering. *See Hickman v. Winston Cnty. Hosp. Bd.*, 508 So. 2d 237, 239 (Ala. 1987) (A claim for tortious interference can be brought against an individual employee if that employee acted outside the scope of his or her employment and acted with actual malice.); *Kelly v. City of Mesa*, 873 F. Supp. 320, 333 (D. Ariz. 1994) (An employee cannot be liable for tortious interference if he or she acted within the scope of his or her employment); *Palmer v. Ark. Council*, 40 S.W.3d 784, 791 (Ark. 2001) (An agent is not liable for tortious interference if he or she is acting within the scope of his or her authority); *Crossen v. Foremost-McKesson Inc.*, 537 F. Supp. 1076, 1080 (N.D. Cal. 1982) (Corporate agents and employees who induce a breach of contract cannot be liable for tortious interference unless their actions were "wrongful and unprivileged."); *Murray v. Bridgeport Hosp.*, 480 A.2d 610, 613 (Conn. Super. Ct. 1984) (An agent cannot be liable for tortious interference if he or she is acting within the scope of his or her authority.); *Curaflex Health Servs. v. Bruni*, 899 F. Supp. 689, 695 (D.D.C. 1995) (An officer can induce a breach of contract as long as he or she does not "exceed the scope" of his or her authority or knowingly cause harm to the corporation.); *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. Dist. Ct. App. 1992) (An agent of a corporation is not considered a third party if he or she acts within his or her scope of employment.); *Dong v. Shepeard Cmty. Blood Ctr.*, 522 S.E.2d 720, 722 (Ga. Ct. App. 1999) (An officer is not liable for tortious interference if he or she acted within her authority.); *BECO Const. Co. Inc. V. J-U-B Eng'rs Inc.*, 184 P.3d 844, 849 (Idaho 2008) ("[A]n agent is only liable for actions which are outside its scope of duty to the corporation."); *Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486, 507 (Ill. Ct. App. 2019) (As long as an employee "is acting in accordance with the interest of the employer," he or she will not be liable for tortious interference, even if the employee is acting with bitterness and hostility.); *Martin v. Platt*, 386 N.E.2d 1026,

1028 (Ind. Ct. App. 1979) (An officer acting in the scope of his official duties cannot be liable for tortious interference.); *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008) (An officer acting with justification who causes the corporation to breach a contract cannot be held liable for tortious interference.); *9 to 5 Fashions Inc. v. Spurney*, 538 So. 2d 228, 232 (La. 1989) (An actor cannot be liable for tortious interference if his or her action was justified and within the scope of his or her employment.); *Bleich v. Florence Crittenton Serv. of Baltimore Inc.*, 632 A.2d 463, 475 (Md. Ct. Spec. App. 1993) (An employee is not considered a third party if he or she acts within the scope of his or her employment.); *Rhodes v. JPMorgan Chase & Co.*, 562 F. Supp. 2d 186, 197 (D. Mass. 2008) (A supervisor acts within the scope of his authority when he or she fires an at-will employee, unless his or her actions are "unrelated to any legitimate corporate interest."); *Lawsuit Fin. L.L.C. v. Curry*, 683 N.W.2d 233, 241 (Mich. Ct. App. 2004) (A plaintiff has a prima facie case for tortious interference if he or she can prove an employee acted outside the scope of his or her authority as an agent of a corporation.); *Furley Sales & Assocs. Warehouse Inc. v. N. Am. Auto.*, 325 N.W.2d 20, 26 (Minn. 1982) (A corporate officer cannot be held liable for tortious interference when he or she is acting in the "best interests of the corporation."); *Gill v. Farm Bureau Life Ins. Co.*, 856 S.W.2d 96, 100 (Mo. Ct. App. 1993) (An employee cannot be held liable for tortious interference when his or her actions that the plaintiff complains of were within the course and scope of his or her employment.); *Baillie v. Rollins*, 530 P.2d 440, 442 (Mont. 1974) (An employee who acts within the course and scope of his or her employment is not a third party to a contract and cannot be sued individually for tortious interference); *Davis v. Ricketts*, 765 F.3d 823, 829-30 (8th Cir. 2014) (The Nebraska Supreme Court has held that a supervisor cannot become a third party if his or her actions were "committed in furtherance of some purpose other than the lawful purposes of the employer." (quoting *Huff v. Swartz*, 606 N.W.2d 461, 466 (Neb. 2000))); *Balsamo v. Univ. Sys. of N.H.*, No. 10-CV-500-PB, 2011 WL 4566111, at *5 (D.N.H. Sept. 30, 2011) ("A defendant's employee will not be deemed to be a third party for purposes of a tortious interference claim if the employee was acting within the scope of his employment when he engaged in the conduct that gives rise to the claim."); *Vosough v. Kierce*, 97 A.3d 1150, 1160 (N.J. Sup. Ct. App. Div. 2014) (An employee will only be liable for tortious interference if he or she was acting "outside the scope of his or her employment or agency."); *Bogle v. Summit Inv. Co.*, 107 P.3d 520, 528 (N.M. Ct. App. 2005) (For an employee to be individually liable for tortious interference, the plaintiff must show the employee acted with "improper motive or by use of improper means."); *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996) (An employee is considered a third party if he or she "exceeded the bounds of his or her authority."); *Murphy v. McIntyre*, 317 S.E.2d 397, 329-30 (N.C. Ct. App. 1984) ("Plaintiff's evidence must show that defendant had no *legal* justification for his action; proof of actual malice is not sufficient," and if an employee's actions are within the scope of his or her authority, then they are not malicious.); *Abdullah v. State*, 771 N.W.2d 246, 256 (N.D. 2009) ("A state employee may not be held liable in the employee's individual capacity for acts occurring within the scope of the employee's

employment."); *Courie v. ALCOA*, 832 N.E.2d 1230, 1237 (Ohio Ct. App. 2005) (Supervisors acting within the scope of their employment are not individually liable for tortious interference.); *Voiles v. Santa Fe Minerals Inc.*, 911 P.2d 1205, 1210 (Okla. 1996) (An employee acting in his or her "representative capacity" cannot be considered a third party liable for tortious interference.); *McGanty v. Staudenraus*, 901 P.2d 841, 846 (Or. 1995) (An employee is not considered a third party to a contract when he or she is acting within his or her scope of employment.); *Daniel Adams Assocs. Inc. v. Rimbach Pub. Inc.*, 519 A.2d 997, 1002 (Pa. Super. Ct. 1987) (When a corporate agent, acting in the scope of his or her authority, terminates a contract between the corporation and the plaintiff, the corporate agent is not considered a third party, and there is no claim for tortious interference.); *Dutch Fork Dev. Grp. II LLC v. SEL Props. LLC*, 753 S.E.2d 840, 844 (S.C. 2012) (If an officer or agent is acting within the scope of his employment when he or she induces the corporation to breach its contract with the plaintiff, the officer is not considered a third party, and there is no claim for tortious interference.); *Gruhlke v. Sioux Empire Fed. Credit Union*, 756 N.W.2d 399, 406-07 (S.D. 2008) ("[W]hen an employee is acting within the scope of the employee's employment, and the employer, as a result, breaches a contract with another party, that employee is not a third party for the tort of intentional interference with economic relations."); *Forrester v. Stockstill*, 869 S.W.2d 328, 334-35 (Tenn. 1994) (A corporate director, officer, or employee acting within his or her authority is not considered a third party.); *Hood v. Edward D. Jones & Co. L.P.*, 277 S.W.3d 498, 502-03 (Tex. Ct. App. 2009) (An employee acting within the scope of his employment cannot tortiously interfere with a contract between his employer and the plaintiff.); *Guisti v. Sterling Wentworth Corp.*, 201 P.3d 966, 979 (Utah 2009) ("When the defendants are also employees, however, the plaintiff must establish that the defendants were acting outside the scope of their employment for purely personal reasons."); *Murray v. St. Michael's Coll.*, 667 A.2d 294, 300 (Ver. 1995) (A claim of tortious liability is only applicable if the employee acted outside his or her scope of employment in an effort to further his or her own interests.); *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) (An employee was not acting outside the scope of his employment, so he was considered an agent of the city and not a third party.); *Houser v. City of Redmond*, 586 P.2d 482, 485 (Wash. 1978) ("[E]mployees are only third parties if they were not acting within the scope of their employment."); *Hartfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395, 403 (W. Va. 2008) (Employees were not acting outside the scope of their employment when they "ordered that the appellant's employment be terminated," so they cannot be held liable for tortious interference.); *Rammell v. Mountainaire Animal Clinic P.C.*, 442 P.3d 41, 49 (Wyo. 2019) ("An employee of a company is not liable for the company's breach of contract on the theory that the employee induced such breach if he acts in his official capacity, on behalf of the company, and not as an individual for his own advantage.").

[5] The Defendants emphasize that at least twenty courts, both state and federal, have relied on Restatement (Second) of Torts section 772 in whole or in part and reasoned that

¶28. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., AND WILSON, P.J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

---

an individual relaying truthful information to a contracting party cannot be subject to tortious interference with a contract. *See, e.g.*, *Thompson v. Paul*, 402 F. Supp. 2d 1110, 1116-17 (D. Ariz. 2005), *overruled on other grounds by Thompson v. Paul*, 547 F.3d 1055 (9th Cir. 2008); *Francis v. Dun & Bradstreet Inc.*, 3 Cal. App. 4th 535, 540 (Cal. Ct. App. 1992); *Commonwealth Const. Co. v. Endecon Inc.*, C.A. No. 08C-01-266-RRC, 2009 WL 609426 at *6 & n.34 (Del. Super. Ct. Mar. 9, 2009); *Int'l City Mgmt. Ass'n Ret. Corp. v. Watkins*, 726 F. Supp. 1, 6 (D.D.C. 1989); *Worldwide Primates Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir. 1994); *Kutcher v. Zimmerman*, 957 P.2d 1076, 1090-91 (Haw. Ct. App. 1998); *Soderlund Bros. Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10 (Ill. App. Ct. 1995); *Glass Serv. Co. Inc. v. State Farm Mut. Auto. Ins. Co.*, 530 N.W.2d 867, 871 (Minn. Ct. App. 1995); *Macke Laundry Serv. Ltd. Partnership v. Jetz Service Co.*, 931 S.W.2d 166, 181 (Mo. App. Ct. 1996); *Recio v. Evers*, 771 N.W.2d 121, 132-33 (Neb. 2009); *Montrone v. Maxfield*, 449 A.2d 1216, 1217-18 (N.H. 1982); *East Penn Sanitation Inc. v. Grinnell Haulers Inc.*, 682 A.2d 1207, 1218 (N.J. Super. App. Div. 1996); *Dryden v. Cincinnati Bell Tel. Co.*, 734 N.E.2d 409, 414 (Ohio Ct. App. 1999); *Walnut St. Assocs. Inc. v. Brokerage Concepts Inc.*, 20 A.3d 468, 479 (Pa. 2011); *Inst. Inc. v. S&H Computer Sys. Inc.*, 605 F. Supp. 816, 831 (M.D. Tenn. 1985); *Fin. Rev. Servs. Inc. v. Prudential Ins. Co. of Am.*, 50 S.W.3d 495, 505 (Tex. App. 1998); *Koch v. Mut. of Enumclaw*, 31 P.3d 698, 701 (Wash. Ct. App. 2001); *Tiernan v. Charleston Area Med. Ctr. Inc.*, 506 S.E.2d 578, 592-93 (W. Va. 1998); *Liebe v. City Fin. Co.*, 295 N.W.2d 16, 20 (Wisc. Ct. App. 1980); *Allen v. Safeway Stores Inc.*, 699 P.2d 277, 280 (Wyo. 1985).