753 S.E.2d 840

DUTCH FORK DEVELOPMENT GROUP II, LLC
and Dutch Fork Realty, LLC, Respondents,

v.

SEL PROPERTIES, LLC and Stephen E. Lipscomb,
Defendants, of whom Stephen E. Lipscomb is
the, Appellant.

Appellate Case No. 2008–087486.

No. 27139.

Supreme Court of South Carolina.

Heard May 2, 2012.
Refiled Aug. 22, 2012.

A. Camden Lewis and Keith M. Babcock, both of Lewis and Babcock, of Columbia, for Appellant.

Carmen Vaughn Ganjehsani and Charles E. Carpenter, Jr., both of Carpenter Appeals and Trial Support, of Columbia; Glenn E. Bowens, of Blythewood, and Anthony S.H. Catone, of Lexington, for Respondents.

## ORDER

After careful consideration of the petition for rehearing, the Court is unable to discover that any material fact or principle of law has been either overlooked or disregarded, and hence, there is no basis for granting a rehearing. Accordingly, the petition for rehearing is denied. However, we withdraw our original opinion and substitute it with a revised opinion.

/s/JEAN H. TOAL, C.J.

/s/DONALD W. BEATTY, J.

/s/JOHN W. KITTREDGE, J.

/s/KAYE G. HEARN, J.

/s/JAMES E. MOORE, A.J.

FOR THE COURT

Justice BEATTY.

Stephen E. Lipscomb ("Appellant"), the manager of SEL Properties, LLC ("SEL") appeals a jury verdict against him for tortious interference with a contract entered into by SEL with Dutch Fork Development Group, II, LLC and Dutch Fork Realty, LLC (collectively "Respondents"). Appellant contends that he, as the manager of the limited liability

company, cannot be held individually liable in tort for a contract that was breached by SEL. Alternatively, Appellant challenges the jury's award of $3,000,000 in actual damages to Respondents on the grounds: (1) the trial judge erred in charging the jury that lost customers and lost goodwill were elements of damages as there was no evidence of such damages; and (2) the award was improper and should have been reduced as the actual damages for the tort claim were "coextensive" with or subsumed in the jury's award of actual damages to Respondents for the breach of contract claim against SEL. After we issued our original opinion finding that Appellant was entitled to a directed verdict as to the claim of tortious interference with a contract and, in turn, reversing the jury's award of damages, Respondents petitioned for rehearing. We deny the petition for rehearing, withdraw our original opinion, and substitute it with this opinion that revises the conclusion section of the original opinion.

## I. Factual/Procedural History

As a result of discussions with Donald and William Melton, members of Dutch Fork Development Group, II, LLC ("DFDG") and Dutch Fork Realty, LLC ("DFR"), SEL purchased a 122.28–acre piece of property in Richland County for $800,000 on August 8, 2000. The property, which was to be known as Rolling Creek Estates, was the subject of two contracts entered into between SEL and Respondents for the development of residential subdivisions.

The parties entered into the first contract on November 14, 2000, which involved the development of the Courtyards at Rolling Creek ("Courtyards") in Phases I, II, and III. The second contract, which was entered into on October 17, 2002 and contained substantially the same terms as the first contract, involved the development and marketing of a 14.9–acre parcel that was to be known as Rolling Creek Phase 4 ("Rolling Creek").

Pursuant to the first contract, the parties agreed to develop the Courtyards in three phases over the five-year term of the contract. SEL was responsible for: securing financing for the purchase of the property; securing engineering studies, surveying, and landscaping; and the costs related to the infra-

structure. SEL also had "final approval of all costs pertaining to the development of the property."

In terms of Respondents, DFDG was responsible for the development of the property. In consideration of adequate performance, SEL was to pay DFDG: (1) a development fee of $54,000 for each phase of the development, which was contingent upon the sale of 60% of the lots developed in the phase and the "letting" of the contract of the next phase; and (2) 25% of the net profits received from the sale of the lots sold in each of the three phases.

DFR was granted the "exclusive right to sell" for "a period of five (5) years provided that DFR [sold and closed] no less than twenty (20%) percent of the lots available for sale per year in each Phase of the development." Additionally, DFR was granted the "exclusive right to sell new homes construct-ed in the development at a sales commission not to exceed seven (7) percent" for a period of "twelve (12) months after construction is commenced on the home." DFR was also entitled to a real estate commission of 10% upon the closing of the sale of developed lots to non-builders; however, DFR would not receive a commission for any lot sales to builders.

On November 19, 2001, SEL obtained a loan from the National Bank of South Carolina ("NBSC") in the amount of $2,001,375 to provide for the development of Phase I of the Courtyards. Shortly thereafter, SEL was reimbursed $800,000 from the loan proceeds for the original land acquisi-tion. Appellant, however, personally guaranteed that the development loan would be repaid and that expenses would be covered.

According to Respondents, the sale of lots was delayed for nearly a year due to SEL's failure to obtain a bonded plat until August 22, 2002, which, in turn, prevented DFR from initiating sales until the infrastructure was completed. After the infrastructure was installed, it was discovered that the roads were subject to isolated pavement failures. Because the repairs were not made expeditiously, a decision Respondents attributed to SEL's failure to fund, the road sustained signifi-cant deterioration that resulted in costly reconstruction and delays in sales.

In addition to these structural delays, Respondents discovered that Appellant, without the knowledge of DFDG, contacted the project engineer to redesign the development plans for Phases II and III. SEL's failure to promptly pay the engineering firm delayed the final approval of the redesigned plans until March 1, 2007 and, in turn, DFR's sale of the lots in this portion of the Courtyards.

These delays were compounded by financial problems as Phase I incurred expenses that exceeded the original budget and proceeds from the development loan. Due to the resultant cash flow problem, SEL incurred overdraft charges and work delays stemming from the failure to promptly pay the engineering firm and contractors.

Respondents' dissatisfaction with SEL's handling of the project was exacerbated by the discovery that lots were being sold at a price below fair market value to K & L Contracting, LLC ("K & L"), a home construction company that was managed in part by Appellant. According to Respondents, these sales from SEL to K & L circumvented its "exclusive right to sell" and prevented them from receiving commissions on homes that were sold by K & L.

By letter dated May 28, 2004, SEL terminated the development contract. In the letter, SEL referenced the "numerous road problems and budget problems throughout the development." As the primary basis for termination, SEL cited "[t]he failure of DFDG and DFR to sell at least twenty (20%) percent of the available lots in any one year period." Respondents challenged the termination, asserting the requisite number of lots had been sold.

Following the termination, SEL continued to sell and close lots. Ultimately, SEL entered into a contract on September 15, 2006 with Essex Homes, SE, Inc. ("Essex Homes") in the amount of $7,633,000 for the development of Phases II and III.

In February 2005, Respondents filed an action against SEL and Appellant. As to SEL, Respondents alleged causes of action for breach of contract and breach of contract accompanied by a fraudulent act. Respondents further alleged against Appellant, in his individual capacity, causes of action for conversion and tortious interference with a contract.

At trial, Appellant admitted that Respondents were owed money as a result of SEL's breach of the two contracts.[1] Appellant, however, disputed that Respondents were entitled to $3,030,667[2] in total damages,[3] which was the amount claimed by Respondents' expert witness, Lynn Richards. Appellant also maintained that his decisions and actions regarding the project were not made for his personal benefit but, rather, on behalf of SEL.

Prior to the submission of the case to the jury, the judge directed a verdict in favor of Appellant as to Respondents' cause of action for conversion. Additionally, the judge directed a verdict in favor of Respondents as to SEL's breach of the contract in failing to pay Respondents the Phase I development fees in the amount of $54,000. In the charge, the judge noted this ruling and instructed the jury on the remaining breach of contract claims against SEL and recoverable damages. The judge also instructed the jury regarding the separate claim of tortious interference with a contract against Appellant and the recoverable damages.

Ultimately, the jury returned a verdict in favor of Respondents against SEL in the amount of $299,144[4] in actual

---

1. Appellant acknowledged that Respondents had in fact complied with the sales requirement of the contract and were only three lots short of reaching the 60% mark to proceed to the next phase. He, however, claimed that at the time the termination letter was written he mistakenly believed Respondents were required to sell two lots per month.

2. This amount represents: $162,000 (Development Fees) + $1,121,950 (Profit Split) + $1,746,717 (Real Estate Commissions) = $3,030,667

3. In his closing argument, defense counsel claimed the damages should total $242,717. According to counsel, this amount represented Phase I and Phase IV damages plus the development fee for Phase IV. This amount was based on the testimony of SEL's expert witness, Marty Ouzts, who limited his calculation of damages to those that were incurred prior to the intended expiration of the contract in November 2005.

4. In addition to the general verdict form, the jury was given special interrogatories with respect to the actual damages for the breach of contract claim. The question posed was as follows: "For the Breach of Contract cause of action, does the amount of actual damages include an award for Phase 2 and/or Phase 3?", to which the jury answered "Yes." The jury noted that it attributed $54,000 of the total actual damage award to Phase 2.

damages for the breach of contract cause of action and $1,000,000 in punitive damages for the breach of contract accompanied by fraudulent act claim. The jury returned a verdict in favor of Respondents against Appellant in the amount of $3,000,000 in actual damages and $1,000,000 in punitive damages for the tortious interference with a contract cause of action.

Following the denial of post-trial motions, SEL and Appellant appealed the jury's verdicts to the Court of Appeals. Two months later, SEL settled the claims for breach of contract and breach of contract accompanied by a fraudulent act by paying $1.5 million to Respondents. As a result of the settlement, SEL dismissed its appeal. This Court certified Appellant's appeal from the Court of Appeals pursuant to Rule 204(b), SCACR.

## II. Discussion

### A.

Although Appellant identifies three issues and raises multiple theories, his primary contentions are that: (1) he, as the manager of SEL, cannot be held individually liable for the claim of tortious interference with the contract; and (2) even if he is liable, the award of actual damages was improper. Essentially, Appellant claims Respondents' only form of recovery was for a breach of contract claim, a claim that has now been satisfied through a settlement agreement. For reasons that will be discussed, we agree with Appellant.

### B.

Appellant contends that as a matter of law he, as the manager of an LLC, may not be held individually liable for a claim of tortious interference with a contract. Citing section 33-44-303(a) of the South Carolina Code,[5] Appellant asserts

---

5. Section 33-44-303(a) provides:

Except as otherwise provided in subsection (c), the debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the company. A member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager.

that he is statutorily protected against "this type of individual liability."

Alternatively, Appellant avers that even if he can be found individually liable in tort, he was immune from liability as he acted on behalf of SEL and, thus, was a party to the contract that was breached by SEL. Citing the general rule that one cannot be held liable for tortious interference with a contract to which he is a party, Appellant argues the trial judge erred in denying his motions for a directed verdict and judgment notwithstanding the verdict ("JNOV") as to the claim of tortious interference with a contract.

█ Recently, a majority of this Court rejected Appellant's contention that a manager of an LLC may not be held individually liable for torts of the LLC. *16 Jade Street LLC v. R. Design Constr. Co., LLC,* 728 S.E.2d 448 (2012), *rehearing granted,* (May 4, 2012). *Jade Street,* however, is not dispositive as the instant case involves a separate question of whether Respondents could sustain a claim of tortious interference with a contract. In answering this question, we must examine the general rule that a claim for tortious interference with a contract cannot be made against one who is a party to the contract at issue. Specifically, we must decide whether Appellant was a party to the contract that was admittedly breached by SEL. In analyzing this question, it is necessary to identify the elements of the tort and the privileges afforded a corporate agent whose corporation is a party to the contract.

█ "The elements of a cause of action for tortious interference with contract are: (1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." *Camp v. Springs Mortgage Corp.,* 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993). "[A]n action for tortious interference protects the property rights of the parties to a contract against unlawful interference by third parties." *Threlkeld v. Christoph,* 280 S.C. 225, 227, 312 S.E.2d 14, 15 (Ct.App.1984). "Therefore, it does not protect a party to a contract from actions of the other party." *Id.*

---

S.C.Code Ann. § 33–44–303(a) (2006).

"It is generally recognized that when a contract is breached by a corporation as the result of the inducement of an officer or agent of the corporation acting on behalf of the corporation and within the scope of his employment, the inducement is privileged and is not actionable." *Bradburn v. Colonial Stores, Inc.*, 273 S.C. 186, 188, 255 S.E.2d 453, 455 (1979). Thus, "[t]he actions of a principal's agent are afforded a qualified privilege from liability for tortious interference with the principal's contract." *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 F.3d 375, 385 (3d Cir.2004). *See generally* Thomas G. Fischer, Annotation, *Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another*, 72 A.L.R.4th 492, §§ 3–8 (1989 & Supp.2012) (analyzing state cases involving the question of whether a director, officer, or employee could be held personally liable for tortious interference with a corporate contract where individual was considered a party to the contract, acted to serve the corporate interests, or acted on behalf of personal interests).

"The reason for this privilege is that holding an agent liable would be like holding the principal itself liable for the tort of interfering with its own contract, instead of holding the principal liable for breach of contract." *CGB Occupational Therapy, Inc.*, 357 F.3d at 385. "The agent's privilege is qualified, however, because it applies only when the agent is acting within the scope of its authority." *Id.* "Conversely, an agent may be liable for tortious interference, just as if the agent were an outside third party, if the allegedly interfering acts were conducted outside the scope of the agent's authority." *Id.; Kia v. Imaging Scis. Int'l, Inc.*, 735 F.Supp.2d 256, 268 (E.D.Pa.2010) ("[A] corporate officer can be liable for tortious interference only if he was acting in a personal capacity or outside the scope of his authority." (citations omitted)); *see* 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations*, Chapter 11, XXVIII, § 1117 (West 2012) ("[A] director is not personally liable for the corporation's contractual breaches unless he or she assumed personal liability, acted in bad faith, or committed a tort in connection with the performance of the contract."). "Scope of authority" is defined as "[t]he range of reasonable power that an agent has been delegated or might foreseeably be delegat-

ed in carrying out the principal's business." *Black's Law Dictionary* (9th ed.2009).

 Therefore, as a matter of law, a manager of a limited liability company can wrongfully interfere with his company's contracts and be held individually liable for his acts. In light of this holding, the question becomes whether Appellant could be held liable under the facts of the instant case.

 As a threshold matter, we find Respondents' failure to include SEL's operating agreement as part of the record constitutes a significant impediment to establishing a claim of tortious interference with a contract as we are unable to discern the precise parameters of Appellant's authority.[6] Without an identifiable scope of authority, we are left to speculate whether Appellant's actions exceeded his authority as the managing agent of SEL.[7] Furthermore, we find that each of the actions relied upon by Respondents to support their claim can only be attributed to SEL and not to Appellant personally.

In support of their claim, Respondents primarily relied upon the sale of lots to K & L, the redesign of the development plans for Phases II and III, the termination of the contract, and the sale of the project to Essex Homes. Respondents

---

**6.** The operating agreement governs:

(1) relations among the members as members and between the members and the limited liability company;

(2) *the rights and duties of a person in the capacity of manager;*

(3) the activities of the company and the conduct of those activities; and

(4) the means and conditions for amending the operating agreement. 51 Am.Jur.2d *Limited Liability Companies* § 4 (2011) (emphasis added); *see* S.C.Code Ann. § 33–44–103(a) (2006) (providing that under the Uniform Limited Liability Company Act of 1996, members of an LLC may enter into an operating agreement, "to regulate the affairs of the company and the conduct of its business, and to govern relations among the members, managers, and company").

**7.** We disagree with Respondents' contention that the contract established the limitations on Appellant's authority. The contract established the rights and duties of SEL and Respondents with respect to the development project and not the authority of Appellant with respect to SEL. *See* 17A Am.Jur.2d *Contracts* § 1 (2004) ("'[A] 'contract' has been defined as a private, voluntary, allocation by which two or more parties distribute specific entitlements and obligations.").

maintain there was no legitimate business justification for these actions and, thus, did not serve the corporate interests of SEL. In turn, Respondents contend the only logical inference is that Appellant acted in his personal capacity as his actions would not have been authorized by SEL.

With respect to each of these actions, the documentation in the record establishes that SEL was the entity that sold the lots, signed off on change orders for the development plans, terminated the contract, and entered into the contract with Essex Homes. Although Appellant was the principal actor in these transactions, there is no evidence to refute that he acted within his authority as the manager of SEL.

Even if Appellant, as a member of K & L, received financial benefit from the sale of the lots to K & L, the sales were nevertheless done on behalf of SEL. Notably, Respondents relied on these lot sales to establish that they had in fact satisfied the sales requirement prior to SEL's breach of the contract. Furthermore, the sale of Phases II and III to Essex Homes was entered into by SEL after it terminated the contract with Respondents. Even though Appellant engaged in negotiations during the term of the contract, these actions were also done on behalf of SEL and only provide evidence to support the breach of contract claim. The jury recognized this fact as it compensated Respondents for their losses in Phases II and III by awarding damages for the breach of contract cause of action.

Finally, by personally guaranteeing the development loan, Appellant became personally liable for the repayment of that particular financial obligation. The personal guarantee did not, however, render him personally liable in tort. *See Hester Enters., Inc. v. Narvais,* 198 Ga.App. 580, 402 S.E.2d 333, 335 (1991) ("[A] corporate officer who does personally guarantee an obligation may be personally liable for the performance of *that* particular obligation, but such a personal guarantee does not render him personally liable on *any and all* corporate obligations.").

We conclude Respondents failed to identify how Appellant exceeded his authority as the managing agent of SEL. Because Appellant's actions can only be attributable to SEL, there is an absence of evidence to establish a separate claim

that Appellant was individually liable in tort. Accordingly, we hold the trial judge erred in denying Appellant's motions for a directed verdict and JNOV on the cause of action for tortious interference with a contract. *See Steinke v. S.C. Dep't of Labor, Licensing & Regulation,* 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999) (recognizing that an appellate court will reverse the trial judge's ruling with respect to the denial of motions for a directed verdict or JNOV only when there is no evidence to support the ruling or when the ruling is controlled by an error of law).

In view of our holding, we need not address Appellant's remaining issues regarding the award of damages. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 518 S.E.2d 591 (1999) (providing that an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

## III.

Based on the foregoing, we hold the trial judge erred in denying Appellant's motions for a directed verdict and JNOV as there is no evidence to support the cause of action for tortious interference with a contract. Specifically, we find Respondents' failure to include SEL's operating agreement as part of the record precludes us from being able to discern the precise parameters of Appellant's authority. Furthermore, Respondents failed to identify how Appellant exceeded his authority as the managing agent of SEL. Thus, because Appellant's actions can only be attributable to SEL, there is an absence of evidence to establish a separate claim that Appellant was individually liable for the cause of action for tortious interference with a contract. Accordingly, we reverse the award of damages on this cause of action.

**REVERSED.**

TOAL, C.J., KITTREDGE, HEARN, JJ., and Acting Justice JAMES A. MOORE, concur.