


**E-FILED**
**CNMI SUPREME COURT**
E-filed: Jun 24 2024 01:27PM
Clerk Review: Jun 24 2024 01:27PM
Filing ID: 73462034
Case No.: 2022-SCC-0008-CIV
NoraV Borja



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**SUN HA PARK,**
*Plaintiff-Appellee,*

***v.***

**EUN SOO HAN,**
*Defendant-Appellant.*

**Supreme Court No. 2022-SCC-0008-CIV**

---

**SLIP OPINION**

**Cite as: 2024 MP 3**

Decided June 24, 2024

_____

CHIEF JUSTICE ALEXANDRO C. CASTRO
ASSOCIATE JUSTICE PERRY B. INOS
JUSTICE PRO TEMPORE ROBERT J. TORRES, JR.
_____

Superior Court Civil Action No. 15-0173
Associate Judge Wesley M. Bogdan
_____

CASTRO, C.J.:

¶ 1     This case stems from a contentious dispute over the ownership and control of a family-owned, closely-held business, Karis Company, Ltd. ("Karis"). After Appellee Sun Ha Park ("Park") invested, and became majority shareholder, in his wife's family business, disputes broke out between Park and his brother-in-law, Appellant Eun Soo Han ("Han"), over management of the business. To resolve the dispute, Yan Han Suk ("Han, Sr.")  who is Han's father and Park's father-in-law, proposed buying out Park's interest in the business and returning the full amount of Park's investment, which Park accepted. Han then acted to remove Park from his positions as a director and treasurer. Park later sued, claiming ownership of the business and alleging tortious interference with contract. The trial court found that Park had willingly accepted the return of his investment, but found that Han's subsequent removal of Park from his positions constituted tortious interference with a contract, awarding Park damages. The primary issue on appeal is whether Han tortiously interfered with a contract. Because Han had implied actual authority to remove Park from the family business, he was acting within the scope of his duties and did not tortiously interfere with a contract between Park and Karis when he removed Park from his positions. Accordingly, we REVERSE the finding of tortious interference and VACATE the damages award.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2      Han, Sr. and his wife Chung Yun Oh ("Ms. Oh") incorporated Karis, each of them owning 50,000 shares of common stock, valued at one dollar per share. Their son, Han, manages and oversees Karis's day-to-day business operations.

¶ 3     In 2013, Han approached his brother in-law Park—who was living in Korea at the time—about investing $450,000 dollars in Karis. In return, Park would become majority shareholder, move to Saipan, and work in the family business.

¶ 4     In April 2014, Park bought 450,000 shares of Karis stock for one dollar per share. Following this transaction, Han, Sr. instructed Han to draft corporate meeting minutes ("April 2014 Minutes") memorializing the sale, and appointing Park a director of Karis and its treasurer. Han, Sr., Ms. Oh, and Park were not physically present at the meeting, but they were aware of the meeting minutes' contents and did not object. Han continued to manage the business while Park remained in South Korea and Han, Sr. remained the president.

¶ 5     Dispute arose between Park and Han over the management and control of Karis. To resolve the dispute, Han, Sr. proposed to buy out Park's entire interest in the company. He instructed Han to deposit around 500 million won ($450,000 dollars) in a Suwon, South Korea, District Court account, to be delivered to Park in exchange for all of his shares. Park accepted and received the money on April 15, 2015.

¶ 6      Learning that Park accepted the money, Han, Sr. further instructed Han to prepare and sign corporate minutes reflecting the return of the shares. ("April

2015 Minutes"). Han drafted the minutes stating that 450,000 shares were split evenly between Han, Sr. and Ms. Oh. Despite having no express instruction to do so, Han also included in the minutes that Park "resigned" from his positions as director and treasurer.

¶ 7 Han also prepared and signed a stock sales purchase agreement ("Sales Agreement") for the sale of 450,000 shares to Han, Sr. and Ms. Oh. Just as he had signed the April 2014 and 2015 Minutes, Han signed the Sales Agreement on behalf of all shareholders and directors, including Park.

¶ 8 While still living in Korea, from April 20, 2015 through July 2015, Park claimed to fulfill his duties and obligations as majority shareholder of Karis. However, Han informed Park he could no longer make any decisions, work at Karis, or enter Karis property. Park eventually moved to Saipan in September 2015. In October 2015, Park sued Han and Han's wife, Kyung Hwa Park ("Ms. Park"), for conversion, fraud, trespass to real property, and interference with contract.[1] He sought declaratory judgments restoring him as a shareholder, director, officer, or employee of Karis, and control of Karis. Park also sought damages in his personal capacity and as a shareholder, director, and officer of Karis, including consequential damages, damages irrespective of special harm, and an award of special and punitive damages.

¶ 9 At trial, Han argued that Han, Sr. had authorized him to sign the April 2015 Minutes, including Park's removal from Karis. Park argued that Han did not have the authority to remove him from his position or sign documents on his behalf. In its ruling, the court found that Han had tortiously interfered with a contract between Park and Karis.[2] First, the court found that Karis was operated in an informal manner that bypassed corporate formalities and rules. The court dispensed with the typical corporate requirements under Commonwealth law because the parties were aware of Karis' informal way of conducting business and accepted it. The court found that Han had prepared and signed the minutes in accordance with the routine business practice and family custom of Karis. The court also acknowledged that Han, Sr. had the authority to remove Park from his position, but found that despite accepting the money, Park never intended to resign from Karis. The court concluded that although Han's motive was to "affect [sic] the wishes of Han, Sr. and/or Karis" to resolve the family dispute, "Han knew he had no authority" to remove Park from Karis. Inferring loss of wage damages from Han's tortious interference, the court awarded Park $90,000 in economic, emotional, and punitive damages. Han timely appeals.

---

[1] On summary judgment, the court dismissed all claims except for tortious interference with contract. Park amended his complaint to add claims for conversion of corporate shares and trespass to chattels. All claims against Ms. Park were dismissed.

[2] The court ruled against Park on his claim for conversion of corporate shares and trespass to chattels. While all of Park's claims are tightly interwoven in the trial record, the only facts we discuss here are those relevant to the issue on appeal—whether Han tortiously interfered with the contract between Park and Karis.

## II. JURISDICTION

¶ 10    We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art. IV, § 3.

## III. STANDARD OF REVIEW

¶ 11    We will not set aside the lower court's factual findings unless we are left with a "firm and definite conviction that clear error has been made." *Commonwealth Ports Auth. v. Tinian Shipping Co., Inc.*, 2007 MP 22 ¶ 14. (citing *Camacho v. L & T Int'l Corp.*, 4 NMI 323, 325 (1996)). "A finding is clearly erroneous when, even though some evidence supports it, the entire record produces the definite and firm conviction that the court below committed a mistake . . . The test is whether the trial court could rationally have found as it did, rather than whether the reviewing court would have ruled differently." *In re Estate of Roberto*, 2010 MP 7 ¶ 64 (internal quotation omitted). We review the lower court's application of the law de novo. *See Del Rosario v. Camacho*, 2001 MP 3 ¶ 41.

¶ 12    "[D]eference extends to credibility judgments made by the trial court regarding the credibility of witnesses." *In re Estate of Malite*, 2016 MP 20 ¶ 7 (citing *Commonwealth v. Guerrero*, 2014 MP 2 ¶ 10).

## IV. DISCUSSION

¶ 13    Han argues the court erred in finding tortious interference with contract because, as Karis's agent, he had authority to remove Park from the corporation. In the alternative, Han argues the damages award were excessive because there is insufficient evidence to support the finding that Park had an employment contract. Because we resolve this appeal under the first issue, we do not reach the alternative argument.

¶ 14    Tortious interference occurs when a person "intentionally and improperly interferes with the performance of a contract . . .  between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Lucky Dev. Co., Ltd. v. Tokai U.S.A., Inc.*, 3 NMI 79, 93 (1992). A person who tortiously interferes with a contract is "subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." *Id*. at 93–94. [3]

¶ 15    Because tortious interference requires interference by a third party, there must be three parties involved for tortious interference to occur. Tortious interference is impossible when the putative tortfeasor and one of the parties to the contract are legally the same entity, or when the putative tortfeasor has acted within the scope of its authority as an agent for one of the parties. The South Carolina Supreme Court has described this principle thus:

---

[3]    We have adopted section 766 of the Restatement (Second) of Torts, which addresses tortious interference with contract. *See Lucky*, 3 NMI at 93–94; *Del Rosario v. Camacho*, 2001 MP 3 ¶ 103.

> [W]hen a contract is breached by a corporation as the result of the inducement of an officer or agent of the corporation acting on behalf of the corporation and within the scope of his employment, the inducement is privileged and is not actionable . . . [because] holding an agent liable would be like holding the principal itself liable for the tort of interfering with its own contract, instead of holding the principal liable for breach of contract.
>
> *Dutch Fork Dev. Group II, LLC v. Sel Props., LLC*, 753 S.E.2d 840, 844 (S.C. 2012) (internal quotations omitted).

Here, to be liable for tortious interference with the contract between Park and Karis—by bringing about Park's removal as a director and treasurer—Han cannot have been acting within the scope of his authority as an agent of Karis.

¶ 16    Agency is a "fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01 (AM. L. INST. 2006). The agent is expected to abide by the instructions and control of the principal, and the principal expects the agent to act in the principal's best interest. *Id*. at § 8.01. The authority of an agent to act on the principal's behalf because of the principal's manifestations to the agent is known as "actual authority." *Id.* at § 2.01.[4]

¶ 17    Actual authority can stem from either express or implied manifestations made by the principal to the agent. It occurs when "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Id*. The restatement provides a roadmap for determining an agent's actual authority:

  (1) An agent has actual authority to take action designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act.

  (2) An agent's interpretation of the principal's manifestations is reasonable if it reflects any meaning known by the agent to be

---

[4] "Actual authority" is distinguished from "apparent authority," which occurs when the manifestations of the principal toward the agent would lead a third party to reasonably believe that the agent has authority to act on the principal's behalf, leaving the principal liable to the third party for the agent's actions, even when the agent lacked the actual authority to act as they did. *Id*. at § 2.03; *Yang Jae Oh v. Angel Enter. Inc.*, 2000 MP 6 ¶ 21. For an agent of a party to a contract to defend their actions as falling within the scope of their authority as an agent, the authority must be actual, not apparent, because apparent authority can only work to the benefit of a third party. *See* RESTAT. 3D OF AGENCY § 2.03cmt. a, c.

ascribed by the principal and, in the absence of any meaning known to the agent, as a reasonable person in the agent's position would interpret the manifestations in light of the context, including circumstances of which the agent has notice and the agent's fiduciary duty to the principal.

(3) An agent's understanding of the principal's objectives is reasonable if it accords with the principal's manifestations and the inferences that a reasonable person in the agent's position would draw from the circumstances creating the agency.

*Id.* at § 2.02.

In essence, "implied authority is express authority circumstantially proved." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 656 (Colo. 2017).

¶ 18    The court found Han improperly interfered "by falsely claiming that [Park] had resigned from Karis." Findings of Fact and Conclusions of Law ("FFCL") at 20. The court found that, "Han has no documents or evidence purporting to show that he had authority as the manager of Karis" to remove Park from the company or "to cause the cessation of any benefits that [Park] was to receive from the engagement he had created for himself by investing $450,000.00 with Karis." *Id.* at 18. But implied actual authority does not require documents or direct evidence demonstrating express authority in Han to remove Park from Karis, only a determination that the circumstances would have led a reasonable person in Han's position to believe he had this authority. RESTAT. 3D OF AGENCY § 2.02. A review of the court's findings of fact about Han, Sr.'s manifestations and objectives, as well as the context under which Han signed Park's resignation in the meeting minutes leads us to conclude that he did reasonably believe that he had authority to act as he did.

¶ 19    The court found that disputes broke out between Park and Han over the management, operation and control of Karis, and Han, Sr. tried to resolve these disputes and make peace between the brothers-in-law. FFCL at 3–4.

¶ 20    The court found that Han, Sr.'s plan to resolve the management dispute involved proposing the return of Park's investment and retaking ownership of the Corporation. *Id.* at 4.

¶ 21    The court found that, for the specific purpose of ending the family dispute, Han, Sr. instructed Han to deposit $450,000.00 (the amount of Park's initial investment) into an account to be delivered to Park in exchange for Park's 450,000 shares of Karis stock. *Id.*

¶ 22    The court found that Park understood that he was under no legal obligation to accept the return of the money in exchange for his shares, and that he knew that the transfer was to resolve the family conflict. *Id.*

¶ 23    The court found that Han drafted and signed the April 2015 minutes and the Sales Agreement in accordance with routine business practice. *Id.*

¶ 24   The court found that in the April 2015 Minutes, Han divided the returned shares equally between Han, Sr. and Ms. Oh, and resigned Park from his positions as director and treasurer of Karis. *Id*.

¶ 25   The court's findings make it clear that the dispute Han, Sr. aimed to resolve was the inability of Park and Han to work together. Han, Sr.'s proposed resolution was to end Park's involvement with Karis by buying out his interest.[5] To achieve peace, Han, Sr. intended for one brother-in-law to stay and the other to go. The court could not have reasonably found that Han, Sr. intended for Park to remain with Karis and continue to participate in its operations given Han, Sr.'s reasons for buying out Park's entire interest in the company.

¶ 26   Also relevant are the court's findings that Karis regularly ignores corporate formalities, and that Han, Han, Sr., and Park were each aware that Han's unilateral preparation and signing of the corporate minutes and other transactional documents on behalf of Park and Han, Sr. was a regular and expected business practice. *Supra* at ¶ 9.

¶ 27   The record supports the court's finding that Han, Sr. tasked Han with executing his proposed resolution of the dispute. Han Sr. stated that he directed Han to remove Park's shares from the corporation:

> Mr. Torres: And to be sure, it's Mr. Sun Ha Park picked up the money?
> Mr. Han [Sr.]: Yes.
> Mr. Torres: And what did you do after you spoke with the court?
> Mr. Han [Sr.]: I called my son Eun Soo Han that he had picked p[sic] the money.
> Mr. Torres: And what else did you tell Mr. Han-what else did you tell Mr. Han?
> Mr. Han [Sr.]: *Since we had returned the money that we should get rid of his shares.*
> Han, Sr. Deposition at 10 (emphasis added).

¶28   When asked about the April 2015 Minutes, Han, Sr. testified that he gave Han permission to prepare and sign the minutes on his behalf:

> Mr. Torres: Did you sign this?
> Mr. Han [Sr.]: No, even this was done by my son.
> Mr. Torres: Did you give permission to your son to sign this on your behalf?
> Mr. Han [Sr.]: Yes.
> *Id.* at 13.

---

[5]   The record makes clear that the "overriding gravamen," of this case is the animosity existing between Park and Han, and the attempts of Han, Sr. to mitigate such strife. *See* FFCL at 20.

¶ 29    Han, Sr. also explained that he ordered Han to transfer Park's shares back to him and his wife, Ms. Oh:

> Mr. Torres: Hold on. When you testified to-earlier that you told you called Mr. Han and told him to transfer the shares-
> Mr. Han [Sr.]: Yes.
> Mr. Torres: -did you mean the shares of Karis Company Ltd.?
> Mr. Han [Sr.]: Yes.
> Mr. Torres: And did Mr. Han listen to you?
> Mr. Han [Sr.]: Yes.
> Mr. Torres: Did he obey you?
> Mr. Han [Sr.]: Yes.
> Mr. Torres: *And is it your understanding that-so, did he transfer the shares of Mr. Park back to you?*
> Mr. Han [Sr.]: *Yes.*
> Mr. Torres: And back to your wife?
> Mr. Han [Sr.]: Yes.
> *Id.* at 15 (emphasis added).

¶ 30    Han's testimony corroborates his father's testimony, explaining that his father authorized him to prepare and sign the minutes:

> Mr. Torres: Whose instruction was this to transfer the shares?
> Han: [Interpreted] My dad did. Yeah.
> Mr. Torres: Now turn to the last page. It says Han Yung Son. Can you see that?
> Han: [Interpreted] Yes.
> Mr. Torres: Who signed that?
> Han: [Interpreted] I did.
> Mr. Torres: Why did you sign that?
> Han: [Interpreted] He says, my dad was not present. He permissioned, and the amount has been - Mr. Park has taken the money back.
> Mr. Torres: So is it your understanding that Mr. Park - because Mr. Park had taken the $450,000 that he no longer had the shares?
> . . .
> Han: [Interpreted] Yes, of course.
> April 8, 2019 Trial Tr. at 37.

¶ 31    Applying the principle that the scope of an agent's authority includes reasonable actions in "accord[ance] with the principal's manifestations and the inferences that a reasonable person in the agent's position would draw from the circumstances creating the agency," RESTAT. 3D OF AGENCY § 2.02(3), we are left with a definite and firm conviction that Han had implied authority to carry out Park's removal from Karis through the April 20, 2015 corporate minutes. The proper analysis is subjective, asking what present circumstances informed Han's decision to sign Park's resignation as treasurer and director. *Id*. at cmt. e.

¶ 32      Here, as the court found, Han knew that it was a regular business practice for Han to draft and sign corporate minutes on behalf of both Park and Han, Sr. And this time, Han, Sr. had directed Han to transfer the Karis shares back to Han, Sr. and Ms. Oh and sign the corporate minutes on Han, Sr.'s behalf. Han knew the ongoing strife at Karis stemmed from his and Park's inability to work together. He also knew Han, Sr.'s decision to return Park's investment and Karis's shares was intended to settle the dispute between himself and Park. Han's knowledge that this exchange was equal and opposite to Park's initial investment—which involved him with Karis, as well as Han, Sr.'s manifested belief that Han would continue to work at Karis—would have reasonably led Han to believe that Han, Sr. intended to end Park's involvement with Karis by removing him.

¶ 33      The court's conclusion that Han tortiously interfered with the contract is based on a misdirected emphasis on Park's intentions instead of Han's understanding of Han, Sr.'s objectives. It is unimportant that Park "never wanted or fully intended to resign from his positions at Karis." FFCL at 5. The trial court acknowledged that Han, Sr., in his capacity as shareholder, had authority to remove Park as a director or an officer of Karis. *See* FFCL at 24. The trial court also concluded that, in his capacity as president of Karis, Han, Sr. had authority to fire an employee. *Id*. Accepting that, once he ceded control of the company back to Han, Sr., Park could be freely removed or fired by Han, Sr., the court should have focused its analysis on whether Han acted as an agent of Han, Sr. because an action for tortious interference with contractual relations requires the existence of a third party's interference with the performance of a contract between two others. *See Lucky Dev. Co., Ltd. v. Tokai U.S.A., Inc.*, 3 NMI 79, 93–94 (1992). Whether Park wanted or intended to resign might have been relevant in an action for breach of contract against Karis, *see Dutch Fork Dev. Group II, LLC v. Sel Props., LLC*, 753 S.E.2d 840, 844 (S.C. 2012), but because Park sued for tortious interference, we concern ourselves only with whether Han was acting within the scope of his duties. It is also irrelevant that Han's removal of Park from his positions at Karis was characterized as a "resignation," despite the court's finding that Park never intended to resign. That Han, Sr. had the authority to unilaterally remove Park once he had bought back the shares makes the specific wording unimportant. This is true in light of the parties' persistent approval of Karis' disregard for corporate formalities.

¶ 34      Similarly, the determination that Han's employment in Karis "did not include deciding whether and when [Park] wanted to *resign* from his positions within the Corporation," FFCL at 20 (emphasis in original), misapprehends the issue. The question is not whether Han's regular duties included assessing and determining if and when to remove the officers and directors of Karis. When assessing the scope of an agent's authority, the law directs the court to ask whether a reasonable person in Han's position, would have, considering the context, interpreted Han, Sr.'s manifestations and objectives as impliedly giving him authority to effectuate Park's removal. RESTAT. 3D OF AGENCY § 2.02.

¶ 35    Han, Sr. instructed Han to deposit the $450,000 investment in a South Korean district court. After Park accepted the return of his investment in South Korea, Han, Sr. further instructed Han to complete the sale of stock by drafting the Sales Agreement. Han, acting with knowledge of Karis's regular informal corporate practices, and Han, Sr.'s manifested objective to resolve the family dispute by ending Park's involvement with Karis, reasonably included Park's removal in the April 2015 Minutes.

## V. Conclusion

¶ 36    The trial court's findings, and the entire record, unequivocally demonstrate Han reasonably acted under the implied actual authority of Han, Sr. Because Han was acting within the scope of his authority, the court erred in holding him liable for tortious interference with contract and we reverse. Because there was no tortious interference, we do not address whether the damages awarded to Park were excessive. We REVERSE the Superior Court's judgment finding Han liable for tortious interference with contract and VACATE the order awarding damages to Park.

SO ORDERED this 24th day of June, 2024.


/s/
ALEXANDRO C. CASTRO
Chief Justice


/s/
PERRY B. INOS
Associate Justice


/s/
ROBERT J. TORRES, JR.
Justice Pro Tempore


COUNSEL

Vincent DLG Torres, Saipan, MP, for Appellant.

Mark Scoggins, Saipan, MP, for Appellee.

*NOTICE*

*This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In any event of discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, email Supreme.Court@NMIJudiciary.gov.*

E-FILED
CNMI SUPREME COURT
E-filed: Jun 24 2024 01:30PM
Clerk Review: Jun 24 2024 01:30PM
Filing ID: 73462037
Case No.: 2022-SCC-0008-CIV
NoraV Borja



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**SUN HA PARK,**
*Plaintiff-Appellee,*

***v.***

**EUN SOO HAN,**
*Defendant-Appellant.*

---

**Supreme Court No. 2022-SCC-0008-CIV**
Superior Court Civil Action No. 15-0173

## JUDGMENT

Defendant-Appellant Eun Soo Han appeals the trial court's order entering judgment against him for tortious interference with contract and awarding Plaintiff Appellee Sun Ha Park damages in the amount of $90,000. For the reasons discussed in the accompanying opinion, the Court REVERSES and VACATES.

ENTERED this 24th day of June, 2024.


  /s/
_____
NORA V. BORJA
Deputy Clerk of the Supreme Court